610 F.2d 131
 4 Fed. R. Evid. Serv. 1459
 EDELSON, Michael, Appellant in No. 78-2627,
v.
SORICELLI, Richard R., M.D. and Clark, James E., M.D. and
Crozer-ChesterMedical Center.
McCORMICK, Harry G., McCormick, Evelyn, husband and wife,
Appellants in No.79-1012,
v.
BAKER, Dan R., M.D.; Guthrie Clinic, Ltd.; The Robert Packer Hospital.
 Nos. 78-2627, 79-1012.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 6, 1979.
Decided Nov. 2, 1979.
As Amended Nov. 15 and Nov. 16, 1979.
 
 Paul Mark Perlstein (argued), Michael F. Eichert, Perlstein & Segal, Philadelphia, Pa., for appellant Edelson, No. 78-2627.
 James Lewis Griffith (argued), Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for appellee Soricelli, No. 78-2627.
 F. James Gallo (argued), Post & Schell, P. A., Philadelphia, Pa., for appellees Soricelli, Clark and Crozer-Chester Medical Center, No. 78-2627.
 Edward J. Carney, Jr., Petrikin, Wellman, Damico & Carney, Media, Pa., for appellee Crozer-Chester Medical Center, No. 78-2627.
 Joseph J. O'Brien, Jr. (argued), Frank J. McDonnell, Haggerty & McDonnell, Scranton, Pa., for appellants, No. 79-1012.
 Richard J. Confair (argued), Joseph A. Quinn, Jr., Joseph J. Heston, Hourigan, Kluger & Spohrer Associates, Wilkes-Barre, Pa., for appellees, No. 79-1012.
 Howard A. Specter, Litman, Litman, Harris & Specter, P. A., Pittsburgh, Pa., for amicus curiae, The Pennsylvania Trial Lawyers Association.
 Before ALDISERT, ROSENN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 The question presented by these consolidated appeals is whether a federal court may entertain a Pennsylvania medical malpractice claim under the diversity statute, 28 U.S.C. § 1332, before the claimant has initially taken recourse to the state Arbitration Panels for Health Care, created by the Pennsylvania Health Care Services Malpractice Act of 1975, 40 P.S. §§ 1301.101 to 1301.1006. Under § 309 of the Act, 40 P.S. § 1301.309, a medical malpractice plaintiff may not have his claim heard on the merits by the Pennsylvania court of common pleas until arbitration proceedings have first been completed, and an appeal filed for trial de novo in the court of common pleas "in accordance with the rules regarding appeals in compulsory civil arbitration and the Pennsylvania Rules of Civil Procedure." 40 P.S. § 1301.509.
 
 
 2
 Appellant Edelson, a citizen of New Jersey, and the McCormick appellants, citizens of New York, brought their respective claims alleging medical malpractice by physicians who are Pennsylvania citizens and by medical institutions located in Pennsylvania and organized under its laws. In both cases, the district courts held that although claimants made the necessary averments for subject matter jurisdiction in the federal courts, exercise of diversity jurisdiction would be improper until the claims were arbitrated under the state arbitration procedure.[1] The district court dismissed Edelson's complaint on the authority of Marquez v. Hahnemann Medical College and Hospital, 435 F.Supp. 972 (E.D.Pa.1976). In the McCormick case the district court held that the Pennsylvania arbitration panel had exclusive primary jurisdiction because the injuries complained of did not occur until after the effective date of the Health Care Arbitration Act.[2] Both dismissals were without prejudice to the plaintiffs' right to file fresh complaints after completing arbitration. We affirm the judgments of both courts.
 
 I.
 
 3
 Appellants argue that federal district courts sitting in Pennsylvania need not await completion of the state arbitration process before entertaining medical malpractice claims within their diversity jurisdiction. Appellants concede the general applicability of Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), which requires federal courts to apply state substantive law to diversity actions, but argue that one of two exceptions to Erie is applicable. First, they argue that the malpractice arbitration program is merely procedural and thus not binding on federal courts. Second, they argue that, even if the program is substantive and therefore normally within the mandate of Erie, the analysis of the Supreme Court in Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), dictates reversal of the district court judgments because "affirmative countervailing (federal) considerations" require the federal courts to grant the plaintiffs immediate access to federal court. We reject both contentions.
 
 II.
 
 4
 The appellants' first argument is that the state arbitration program is a mere procedure, which, under their interpretation of the Supreme Court's decision in Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), is not binding on a federal court sitting in diversity. Although appellants' argument that federal courts must adhere to their own procedures does find some support in Hanna, it neglects what we consider to be the more important teaching of that decision: "(C)hoices between state and federal law are to be made not by application of any automatic, 'litmus paper' criterion, but rather by reference to the policies underlying the Erie rule." Id. at 467, 85 S.Ct. at 1141. The essence of our legal tradition is that the beginning point of legal reasoning, or, stated syllogistically, the major premise, must not be a statement of the suggested conclusion because to engage in this practice is to indulge in Petitio principii, more colloquially referred to as "begging the question." By whatever label, it is a process of circular reasoning that fails to prove the initial thesis propounded and uses the argued thesis as proof of itself. Labeling a legal precept Ab initio as "procedural" or "substantive," without more, contributes nothing to reasoned discourse. It provides no effective guidance in solving difficult problems that arise in diversity cases such as the one before us. Thus, even if we were to agree with appellants by labeling the arbitration requirement procedural, that characterization would not be dispositive; we would still need to examine its effect on diversity litigation under the Erie mandate. See Witherow v. Firestone Tire & Rubber Co., 530 F.2d 160, 163-65 (3d Cir. 1976).
 
 
 5
 Judge Cahn persuasively examined and rejected the argument that the arbitration requirement is procedural in Marquez v. Hahnemann Medical College and Hospital, 435 F.Supp. 972 (E.D.Pa.1976). The court noted that the Supreme Court has interpreted Erie as precluding "maintenance in the federal courts of suits to which the state has closed its courts. Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949)." 435 F.Supp. at 973. Citing Witherow v. Firestone Tire & Rubber Co., 530 F.2d 160 (3d Cir. 1976), for the policies that underlie the Erie doctrine, Judge Cahn concluded: "The major thrust of Erie R. Co. v. Tompkins . . . was to avoid having the outcome of a case depend on whether it was brought in a state or federal court and to permit the state legislatures to define the substantive rights of their citizens." 435 F.Supp. at 974.
 
 
 6
 The reasoning and holding of Marquez comport with what was said in Guaranty Trust Co. v. York, 326 U.S. 99, 109-10, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1944):
 
 
 7
 The nub of the policy that underlies Erie R. Co. v. Tompkins is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away, should not lead to a substantially different result. . . . Erie R. Co. v. Tompkins has been applied with an eye alert to essentials in avoiding disregard of State law in diversity cases in the federal courts. A policy so important to our federalism must be kept free from entanglements with analytical or terminological niceties.
 
 
 8
 For guidance in the case at bar, Guaranty Trust is not only important because it set forth the outcome determinative test, Id. at 109, 65 S.Ct. 1464, but because the subject matter of that case was the state statute of limitations, a statute that regulated the time of entry into the state courtroom. A proper analogy lies here. The Pennsylvania Health Care Services Malpractice Act also regulates the time and, in addition, the means of entry to the courtroom. Guaranty Trust suggested a test for guidance in similar cases:
 
 
 9
 The question is whether (the) statute concerns merely the manner and the means by which (the) right to recover, as recognized by the State, is enforced, or whether such statutory limitation is a matter of substance . . . (that) significantly affect(s) the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court?
 
 
 10
 326 U.S. at 109, 65 S.Ct. at 1470. The obvious answer to the question in these cases is that appellants, as federal plaintiffs seeking medical malpractice damages, may not have rights superior to state citizen plaintiffs because a fundamental notion underlying Erie is that a federal court sitting in diversity merely provides an impartial forum, not a different set of legal rules. Witherow v. Firestone Tire & Rubber Co., 530 F.2d 160, 164 (3d Cir. 1976).
 
 
 11
 Our analysis indicates that the arbitration requirement is a condition precedent to entry into the state judicial system.[3] It is not designed to, nor does it, replace the Pennsylvania common law right of trial by jury, a right that has been elevated to a state constitutional right.[4] Trial by jury is still available to malpractice litigants in the state's courts of common pleas after completion of arbitration. 40 P.S. § 1301.509. As a condition precedent, the arbitration requirement does not differ materially from other preconditions that states may impose on a plaintiff's right to sue in state court, and federal courts have recognized the applicability of these conditions to diversity plaintiffs. See Markham v. City of Newport News, 292 F.2d 711, 714 (4th Cir. 1961). Because the condition would apply without discrimination to both state court and federal court malpractice actions, we conclude that Erie, which requires federal courts to treat diversity claims so as to discourage forum shopping and to reach results identical to the state courts, requires us to give effect to this condition precedent.[5]
 
 III.
 
 12
 Appellants' second argument is that the performance of the arbitration program is so dismal that it will effectively preclude them from a full and fair adjudication of their claims in federal court, thus affronting affirmative countervailing federal considerations. Although they stop short of alleging deprivation of due process,[6] they emphasize that the delays and other inadequacies of the program encourage federal plaintiffs to settle or forgo legitimate claims that would otherwise be litigated before a federal court. By effectively precluding their access to federal judges and juries, they assert, the program conflicts with fundamental federal policies that even the mandate of Erie cannot override. Thus, they conclude, federal courts should provide relief to federal plaintiffs even if the same relief is unavailable to state plaintiffs. To understand and analyze appellants' argument fully, we must examine the factual basis for their contention.
 
 
 13
 The most recent annual report of the administrator of Arbitration Panels for Health Care, required by 40 P.S. § 1301.306 and filed on September 1, 1979 by Professor Arthur S. Frankston, the plan's new administrator, disclosed the following data:
 
 
 14
 Total Claims filed, April 5, 1976 to August 31, 1979:
 
 
 15
 1976 48
1977 422
1978 1,166
1979 830
TOTAL 2,466
 
 
 16
 Claims settled, discontinued, conciliated, and hearings held:
 
 
 17
 Dismissed or discontinued without
 conciliation conference 507
Conciliation Conferences held 563
Conciliation Conferences held in settled,
 discontinued and ended claims 172
Claims which were settled, discontinued
 and ended with two conciliation
 conferences 27
Claims which were settled, discontinued
 and ended with three conciliation
 conferences 7
Claims in which conciliation conferences
 were held and ended with no
 monetary settlement 5
Claims in which two conciliation
 conferences were held and ended with
 no monetary settlement 2
Hearings held 9
Award appealed to court of common pleas 2[7]
 
 
 18
 Although the Act requires seven-member arbitration panels composed of two health care providers, two attorneys, and three lay persons, Professor Frankston reports that from its effective date until September 1, 1979, not one panel of seven members had met to consider a case. In the nine claims for which arbitration proceedings were actually convened, the parties stipulated to proceed with three or five arbitrators. Frankston Report, Supra note 7, at 11. In light of this data, Professor Frankston recommended that the Pennsylvania legislature reduce panel size and streamline the selection process. Id. at 11-12. He concluded his report by emphasizing that without these changes, the arbitration system would continue to preclude prompt and just adjudication of medical malpractice claims. Id. at 16.
 
 
 19
 What we confront is an ambitious state program in which the deed has fallen woefully short of the promise. Of 2,466 claims, only nine have yet reached the hearing stage, the statutory condition precedent to a state court trial. Less than ten percent of the claims have been settled, discontinued, and ended by conciliation conferences, and 507 were dismissed or discontinued without conciliation. Appellants forcefully argue that plaintiffs who have been injured because of medical malpractice have effectively been denied an opportunity to present their cases to a judge and jury. A record that discloses only nine arbitration hearings out of 2,466 claims does not describe a state arbitration system that works exceptionally well, moderately well, or even modestly well. Rather, it describes a system that, though theoretically sound, is actually a resounding flop. Appellants emphasize the patent unfairness of subjecting federal plaintiffs to a state requirement that admittedly fails in its statutory purpose of providing a claimant with "a prompt determination and adjudication of his claim." 40 P.S. § 1301.102. Under these circumstances, it seems onerous, if not futile, to require a federal plaintiff to resort to a state administrative procedure that has proved to be ineffective, inefficient, and incapable of operation under the letter of the statute.
 
 
 20
 Armed with these facts appellants contend that the precept announced in Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), provides the vehicle by which we can avoid the outcome determinative test of Guaranty Trust. In Byrd, the Supreme Court held that the determination of whether the plaintiff was an employee for purposes of the South Carolina Workmen's Compensation Act was a jury question in federal court even though the same issue would be decided in state court by the judge. Appellants here emphasize the Court's concession that determination of the employee issue by a jury in federal court could produce a result different from its determination by a judge in state court. 356 U.S. at 537, 78 S.Ct. 893. The Court stated: "It cannot be gainsaid that there is a strong federal policy against allowing state rules to disrupt the judge-jury relationship in the federal courts. . . . (S)tate statutes and constitutional provisions (cannot) disrupt or alter the essential character or function of a federal court." Id. at 538-39, 78 S.Ct. at 901-902 (footnote omitted). Noting the divergence of this holding from the traditional outcome determinative test, appellants rely on Byrd's emphasis on "affirmative countervailing (federal) considerations." Id. at 537, 78 S.Ct. 893.
 
 
 21
 Appellants further their argument by relying on Wheeler v. Shoemaker, 78 F.R.D. 218 (D.R.I. 1978), which followed the Byrd analysis to avoid the necessity for federal malpractice claimants to arbitrate their claims under a Rhode Island medical malpractice program similar to the one at issue here.[8] Wheeler noted that the schema enacted by Rhode Island, which required the trial court to refer the case to an arbitration panel, was at odds with federal goals. It emphasized that the possibilities that litigation before the arbitration panel would deter the parties from incurring the additional expense of resorting to court or that the jury would adopt the panel's determination without further deliberation were at odds with the federal interest in allowing full litigation before, and determination of factual issues by, a jury. Id. at 222, 226. It also emphasized that the distrust of juries evidenced by the state schema and the state's desire to decrease the number and magnitude of successful malpractice actions were at odds with the federal interest in maintaining the appearance of strict neutrality to federal litigants. Id. at 225-28. Finally, it emphasized that the requirement under the state schema that the trial court appoint the arbitration panel was at odds with the interest of the federal court in convenience and the economical administration of justice. Id. at 229. Chief Judge Pettine concluded:
 
 
 22
 (T)his Court chooses to honor the federal interests in controlling both the character, quality and cost of the adjudicatory process in federal court. This decision is admittedly at the expense of significant state interests in reforming malpractice litigation and federalism interests in avoiding divergent outcomes in state and federal courts. However, Erie principally directs the federal court to apply the state's Substantive law, absent a congressional statute enacted pursuant to an enumerated power that displaces that law. Consistent with the grant of diversity jurisdiction, the federal forum continues to offer the citizen of diverse citizenship an alternate body of practice and procedure, See Guaranty Trust Co. v. York, 326 U.S. 99, 111-12, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); Ely, (The Irrepressible Myth of Erie, 87 Harv.L.Rev. 693, 713 (1974)); See also Hart & Wechsler, The Federal Courts and the Federal System, at 652 (1st ed. 1953) ("juster justice" of federal court permissible). To defer to the federal system's jurisprudential, administrative and financial interests in the federal adjudicatory process does not do violence to the core principles of Erie. Although the open-ended balancing approach of Byrd may result in too much uncertainty to make the approach appropriate for a majority of Erie problems, when both the state and federal interests have the degree of importance that is involved in this case, a federal court must fully consider and balance both. The Hanna touchstones of forum-shopping and inequitable administration of justice have the virtue of certainty but fail to adequately address the more significant concerns of both the state and federal systems at stake in this case.
 
 
 23
 78 F.R.D. at 229. Appellants emphasize that the Pennsylvania malpractice procedure is, in addition, offensive to the federal interest in prompt determination and adjudication of claims. Its inability to litigate claims promptly, they contend, imposes a substantial pressure on them to settle or even forgo their claims, thereby totally depriving them of their opportunity for trial before a federal judge and jury. This oppressive delay also promotes an even greater appearance of unfairness in federal court than the presumably efficient schema the court declined to follow in Wheeler. Notwithstanding this persuasive appeal to our sense of equity, and the well-written opinion by Chief Judge Pettine in Wheeler, we reject appellants' argument as a misreading and overextension of Byrd.
 
 
 24
 We recognize that American jurisprudence has progressed from the day when a court could effectively reason that a precept such as the one generated by Erie "ought to be applied wherever it logically leads, without reference to ulterior results,"[9] for we now disdain "the extension of a maxim or a definition with relentless disregard of consequences to 'a dryly logical extreme.' "[10] It can be said that to reject appellants' position is to welcome the dangers of a jurisprudence of conceptions, of specious technicalities, without regard to a just, common sense theory of merits. Indeed, it can be said that rejecting their position runs counter to Professor Harry W. Jones's definition of a model legal principle: "(T)he durability of a legal principle, its reliability as a source of guidance for the future, is determined far more by the principle's social utility, or lack of it, than by its verbal elegance or formal consistency with other legal precepts."[11] There is little social utility in compelling a federal plaintiff to submit to a time-consuming procedure that, in its present form, is virtually useless.
 
 
 25
 Nevertheless, federal diversity jurisdiction is based on conceptions that have developed since the Judiciary Act of 1789. From Swift v. Tyson, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842), to Erie to Guaranty Trust and Byrd, the Supreme Court has developed a series of conceptions by which federal courts are no more nor less than surrogates that apply precepts created by state legislatures and courts. It is not for the federal courts to evaluate the utility or inutility of these precepts, their desirability or undesirability, or their ability or inability to respond to problems they purport to address. In our diversity role, we simply have insufficient leeway to embrace only the state law we commend and reject that we disdain.
 
 
 26
 Appellants' most effective legal argument is based on the affirmative countervailing federal considerations analysis of Byrd v. Blue Ridge Rural Electric Cooperative, Inc., but the balancing process employed in Byrd does not command rejection of state law here. In Byrd, the Supreme Court relied on three premises to justify its approach. The first premise was that the rule divesting South Carolina juries of power to determine if a person was an employee under the State Workmen's Compensation Act did not rest on a strong and explicit state policy. 356 U.S. at 535, 78 S.Ct. 893. Indeed, this issue was the only factual issue that state law did not allow the jury to decide, but the South Carolina Supreme Court had failed to justify the exception. In contrast, the Pennsylvania legislature has made the state interest in the malpractice arbitration system clear:
 
 
 27
 It is the purpose of this act to make available professional liability insurance at a reasonable cost, and to establish a system through which a person who has sustained injury or death as a result of tort or breach of contract by a health care provider can obtain a prompt determination and adjudication of his claim and the determination of fair and reasonable compensation.
 
 
 28
 40 P.S. § 1301.102. Thus, in this case the state has definite interests, even if unfulfilled, in the operation of the system. We cannot say that the federal interests cited by appellants, even if we were to accept them, outweigh the state interests expounded by its legislature.
 
 
 29
 Byrd also emphasized that access by a federal litigant to a jury is "(a)n essential characteristic" of the federal judicial system, and although it did not directly implicate the seventh amendment, 356 U.S. at 537 n.10, 70 S.Ct. 893, the right rose to near-constitutional significance. See id. at 537, 70 S.Ct. 893; See also Redish & Phillips, Erie And the Rules of Decision Act : In Search of the Appropriate Dilemma, 91 Harv.L.Rev. 356, 385 (1977). Appellants argue that, in the extreme, the system is so time-consuming that plaintiffs are encouraged to settle or forgo trial in court, or that, even if they do patiently await their day in court, the jury will merely adopt the panel's findings. See Wheeler, 78 F.R.D. at 222, 226 (D.R.I. 1978). The result, they argue, is that their right to a jury is totally denied. Although we are impressed by the equities and legislative arguments in appellants' favor, absent a federal consideration that outweighs the legislatively pronounced state interests, federal plaintiffs are entitled to no better treatment than state plaintiffs, who confront these same hurdles before they may obtain access to state court.
 
 
 30
 We find no affirmative countervailing federal consideration here. Far from discouraging arbitration prior to litigation in federal court, the federal legislative and judicial mandates frequently favor arbitration. For example, 9 U.S.C. § 3 allows parties to a contract providing for arbitration to have federal court proceedings stayed pending arbitration of contractual disputes. Similarly, the Labor Management Relations Act of 1947 § 203(d), 29 U.S.C. § 173(d), provides that "(f)inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement," and the Supreme Court in United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), construed § 203(d) as requiring federal courts to refer even frivolous labor disputes to arbitration if the collective bargaining agreements mandate arbitration. Although these examples demonstrate a federal policy favoring consensual arbitration, we perceive no significant federal interest against mandatory arbitration deemed necessary to fulfill an important state objective. Nor is it significant that the arbitration program is more time-consuming than immediate judicial redress, for in each instance in which the federal government has sanctioned arbitration, it potentially lengthens the time between accrual of the dispute and final disposition. In sum, mere delay under a state program that accords with strong federal policies does not constitute such an affront to the federal judicial institution as to warrant the relief appellants seek.
 
 
 31
 Appellants' argument that presentation of the panel's findings to the jury as evidence under 40 P.S. § 1301.510 will predispose the jury and thus usurp its fact finding power also presents no countervailing federal interest. In complex actions in which federal district courts use masters, the master's findings "upon the issues submitted to him are admissible as evidence of the matters found and may be read to the jury, subject to the ruling of the court upon any objections in point of law which may be made to the report." Rule 53(e)(3), Fed.R.Civ.P. We note that medical malpractice actions may frequently involve complex issues centering around proper medical treatment. Another analogue is Rule 704 of the Federal Rules of Evidence, which provides: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Rule 704 altered the common law rule, which allowed an expert witness to state his opinion only in response to a hypothetical question without specifically relating his opinion on the issue before the jury. The Advisory Committee on the rules stated:
 
 
 32
 The (common law) rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information. 7 Wigmore §§ 1920, 1921; McCormick § 12. The basis usually assigned for the rule, to prevent the witness from "usurping the province of the jury," is aptly characterized as "empty rhetoric." 7 Wigmore § 1920, p. 17. Efforts to meet the felt needs of particular situations led to odd verbal circumlocutions which were said not to violate the rule. Thus . . . in cases of medical causation, witnesses were sometimes required to couch their opinions in cautious phrases of "might or could," rather than "did," though the result was to deprive many opinions of the positiveness to which they were entitled, accompanied by the hazard of a ruling of insufficiency to support a verdict. In other instances the rule was simply disregarded, and, as concessions to need, opinions were allowed upon such matters as intoxication, speed, handwriting, and value, although more precise coincidence with an ultimate issue would scarcely be possible.
 
 
 33
 Rule 704, Fed.R.Evid., 28 U.S.C.A. at 512-13 (annotation reprinting Advisory Committee Notes on Rule 704). These federal rules demonstrate confidence by Congress in the jury's ability to evaluate even the most compelling expert presentations. We have no reason to believe the jury would do differently with the arbitration panel's findings.
 
 
 34
 Our conclusion that federal considerations do not countervail the state procedure here is supported by the latitude traditionally accorded state courts to experiment with alternative procedures to enhance their administration of justice. Concurring in Johnson v. Louisiana, 406 U.S. 356, 366, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), Justice Powell commented on the use of experimental procedures by the states:
 
 
 35
 In an age in which empirical study is increasingly relied upon as a foundation for decisionmaking, one of the more obvious merits of our federal system is the opportunity it affords each State, if its people so choose, to become a "laboratory" and to experiment with a range of trial and procedural alternatives.
 
 
 36
 Id. at 376, 92 S.Ct. at 1641. Pennsylvania's decision to experiment with arbitration in the medical malpractice context must be respected as a legitimate exercise of state power. This is particularly true given Pennsylvania's common law tradition of trial by jury, which dates back to 1686 and which, in the opinion of the state's highest court, has not been abridged by the arbitration procedure. Parker v. Children's Hospital, 483 Pa. 106, 394 A.2d 932, 939-42 (1978).
 
 
 37
 Finally, the third premise in Byrd was the continuing viability of the outcome determinative analysis of Guaranty Trust. The Byrd Court emphasized that even if the determination of employee status was made by a jury in federal court, a different result was improbable because a federal judge exerts more authority over trials than his state counterpart. 356 U.S. at 540, 78 S.Ct. 893. The emphasis on preserving a similar outcome indicates the reluctance of the Court to apply federal law, even given significant federal considerations, when it would radically alter the substantive results of the state court system.
 
 
 38
 Our conclusion that Byrd should be read narrowly is also buttressed by the development of the Erie doctrine since Byrd was decided. In Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), the Supreme Court held that a diversity action is commenced when the complaint is filed, as indicated by Fed.R.Civ.P. 4(d)(1), rather than when process is served, as indicated by Massachusetts law. The Court emphasized that decisions must be made in light of the Erie policy of discouraging forum shopping. In choosing the federal rule over the state rule, the Court stated: "Though choice of the federal or state rule will at this point have a marked effect upon the outcome of the litigation, the difference between the two rules would be of scant, if any, relevance to the choice of a forum." 380 U.S. at 469, 85 S.Ct. at 1142-1143. Our decisions have also examined Erie's mandate in this light. In Witherow v. Firestone Tire & Rubber Co., 530 F.2d 160, 164 (3d Cir. 1976), we examined the three policies underlying Erie :
 
 
 39
 First, the prior practice resulted in forum shopping because federal courts could and did apply different substantive law from state courts in the same state. (citation omitted). The decision to require that federal courts apply state substantive law in diversity cases represented a preference for vertical uniformity of substantive law within each state over horizontal uniformity among federal courts nationwide. (citation omitted). . . . The second policy consideration implicit in Erie was more fundamental: the application of disparate laws to identical claims depending solely on the diversity of citizenship Vel non of the parties "introduced grave discrimination by non-citizens against citizens" and "rendered impossible equal protection of the law." Erie, supra, 304 U.S. at 74-75, 58 S.Ct. at 820. In a sense, the conceptual basis of diversity jurisdiction itself discriminates in favor of non-citizens on the theory that, otherwise, they may be discriminated against; and it is premised on the assumption that a non-citizen may obtain a different result in federal court than in state court. Nevertheless, to apply a different rule of law to the non-citizen's case would be contrary to the fundamental notion since Erie, at least that the diversity jurisdiction simply provides an impartial forum, not a different set of legal rules. Finally, Erie reflected judicial concern over the allocation of law-making authority between state and federal governments. . . . (C)ertainly a concern for states' policies and prerogatives can never be out of place in a system of co-ordinate sovereignties as a matter of prudence and comity if not as a matter of constitutional law.
 
 
 40
 (footnote omitted). See also Ely, The Irrepressible Myth of Erie, 87 Harv.L.Rev. 693, 712-13 (1974).
 
 
 41
 Absent an affirmative countervailing federal consideration similar to that found in Byrd, which as we read it implicates no more than trial management in federal courts, we apply the traditional Erie formulation, emphasizing especially the policies of preventing forum shopping by non-resident plaintiffs and avoiding application of different law so as to discriminate against resident plaintiffs. By allowing appellants to avoid the arbitration procedure, we would thwart both these goals. Plaintiffs in diversity actions would have a definite and significant advantage not available to state court plaintiffs. This advantage, which appellants' own arguments demonstrate to be substantial, would encourage forum shopping between the state and federal judicial systems. Such a result is incompatible with Erie. We conclude that federal court plaintiffs in diversity actions arising within the scope of the Pennsylvania Health Care Services Malpractice Act are subject to the same arbitration procedure applicable to state court plaintiffs.
 
 
 42
 In fine, appellants have mounted an argument that is superficially persuasive and appealing, but that should be more properly addressed to the Pennsylvania executive and legislative authorities. Appellants have effectively demonstrated that the state's malpractice arbitration program is in immediate need of drastic restructuring. In describing the program's fundamental deficiencies, they have not demonstrated that it discriminates against non-citizen plaintiffs because the serious deficiencies of the program apply with equal force to citizen plaintiffs. We therefore decline to remove these cases from the general Erie interpretation set forth in Guaranty Trust and Witherow.
 
 
 43
 Accordingly, the judgments of the district courts in both appeals will be affirmed.
 
 
 44
 ROSENN, Circuit Judge, dissenting.
 
 
 45
 I respect the search of the legal and medical professions for an adequate and effective mechanism to resolve malpractice actions outside the judicial system. However, the Pennsylvania Health Care Act (Act) as it presently functions and is structured is neither adequate nor effective and I am constrained to conclude that it does not relieve a federal court from the duty to entertain a medical malpractice claim under the diversity statute. Therefore, I respectfully dissent.[1]
 
 The Health Care Arbitration Act provides:
 
 46
 The arbitration panel shall have original exclusive jurisdiction to hear and decide any claim brought by a patient or his representative for loss or damages resulting from the furnishing of medical services which were or which should have been provided.
 
 
 47
 40 P.S. § 1301.309. The appellants argue that the Act does not deprive the federal courts of diversity jurisdiction. The majority concedes that "appellants have mounted an argument that is superficially persuasive and appealing," but concludes "that should be more properly addressed to the Pennsylvania executive and legislative authorities." Maj. op. at 141. Plaintiffs, non-residents of Pennsylvania, have no recourse to the state legislative or executive authorities. Their sole remedy lies in their quest for an independent federal judicial forum. "Congress adopted the policy of opening the doors of the federal courts to all diversity cases involving the jurisdictional amount to assure suitors from a foreign state of an impartial and neutral forum." Baltimore Bank for Cooperative v. Farmers Cheese Cooperative, 583 F.2d 104, 112 (3d Cir. 1978). I believe this court has a duty to provide that independent forum.[2]
 
 
 48
 The principal reason why I believe there is diversity jurisdiction in this case concerns the nature and function of the arbitration panel. The panel is not an administrative body reviewing claims prior to judicial action but its functions, powers and procedures are those of a judicial entity artfully draped in non-judicial garb.[3] The label attached to it has no real significance. Pennsylvania may not by this device deprive a federal court of diversity jurisdiction.
 
 
 49
 In Tool & Die Makers Lodge Number 78 v. General Electric Company, 170 F.Supp. 945 (E.D.Wis.1959), a Wisconsin district court dealt with a similar issue holding that a case before the Wisconsin Employment Relations Board was an action in state court for purposes of diversity jurisdiction.
 
 
 50
 In the construction of Federal statutes dealing with proceedings in State courts, it is clear that the Supreme Court of the United States has adopted a Functional rather than a literal test. Thus the question of whether a proceeding may be regarded as an action in a State Court within the meaning of the statute is determined by reference to the Procedures and Functions of the State tribunal rather than the name by which the tribunal is designated. Upshur County v. Rich, 1890, 135 U.S. 467, 10 S.Ct. 651, 34 L.Ed. 196; Prentis v. Atlantic Coast Line Co., 1908, 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150. It appears to this court that the proceeding before the Wisconsin Employment Relations Board meets the test of a judicial proceeding within the meaning of the Federal Judicial Code. In respect to subject matter, we repeat again that although the matter is described as an unfair labor practice the action in reality is a simple suit based on alleged breach of contract. . . .
 
 
 51
 In respect of the procedures employable before the Board, a review of the statutory language reveals its judicial character. The action is commenced by a complaint alleging the violations of the contract, the person complained of has the right to file an answer, and the Board sets the time for the hearing of the complaint. . . . Any person failing or refusing to testify or produce books and records may upon application to a circuit court be punished for contempt. . . . Witnesses before the Board receive the same fees and mileage as witnesses in court actions. . . . A record is kept of all proceedings before the Board and such proceedings are governed by the rules of evidence prevailing in courts of equity. . . . The Board makes findings and enters an order stating its determination as to the rights of the parties . . . .
 
 
 52
 170 F.Supp. at 950 (emphasis supplied).
 
 
 53
 Likewise, in Floeter v. C. W. Transport, Inc., 597 F.2d 1100 (7th Cir. 1979), the court adopted the functional test to determine the availability of diversity jurisdiction.
 
 
 54
 We agree with and adopt the First Circuit's analysis in Volkswagen de Puerto Rico. We hold that the title given a state tribunal is not determinative; it is necessary to evaluate the functions, powers, and procedures of the state tribunal and consider those factors along with the respective state and federal interests in the subject matter and in the provision of a forum. Volkswagen de Puerto Rico, Inc. v. Puerto Rico Labor Relations Board, 454 F.2d (38) at 44.
 
 
 55
 597 F.2d at 1102.
 
 
 56
 Unless otherwise directed by the Act, the arbitration panel under review here is bound by the common and statutory law of Pennsylvania as well as the Pennsylvania Rules of Civil Procedure and the Pennsylvania rules of evidence. 40 P.S. § 1301.506. Other powers of the panel are enumerated under section 1301.508 as follows:
 
 
 57
 (a) The arbitration panel (inter alia) is authorized and empowered to:
 
 
 58
 (2) make findings of fact;
 
 
 59
 (3) take depositions and testimony;
 
 
 60
 (6) subpoena witnesses, and administer oaths;
 
 
 61
 (7) apply to the court of common pleas to enforce the attendance and testimony of witnesses and the production and examination of books, papers and records;
 
 
 62
 (8) consider and approve offers of settlement involving fiduciaries, minors and incompetent parties;
 
 
 63
 (9) make determinations as to the liability and award of damages; and
 
 
 64
 (10) exercise all other powers and duties conferred upon it by law.
 
 
 65
 The determinations of the arbitration panel may be appealed by a "trial de novo in the court of common pleas in accordance with the rules regarding appeals in compulsory civil arbitration and the Pennsylvania Rules of Civil Procedure." 40 P.S. § 1301.509. The findings of the panel are evidence in the de novo appeal. Judgment of the arbitration panel may be enforced on motion of the prevailing party by transfer of the action to the court of common pleas for execution. 40 P.S. § 1301.511. The panel has powers of fact-finding, subpoena and, upon application to the Court of Common Pleas, may enforce attendance and testimony of witnesses and production and examination of records. It may determine liability and award damages. In sum, the medical arbitration panel functions as a judicial entity.
 
 
 66
 The appellees place great reliance on the Pennsylvania Supreme Court's decision in Parker v. Children's Hospital, 483 Pa. 106, 394 A.2d 932 (1978), which held that the arbitration panel did not unconstitutionally usurp a judicial function. I find Parker unconvincing for several reasons. First, in Mattos v. Thompson, E.D.Misc. Docket No. 79-124 (Pa., filed September 27, 1979), the Pennsylvania Supreme Court agreed to reexamine the issues in Parker in light of the dismal performance of the Health Care Arbitration Act. Thus, the holding in Parker is of questionable validity. Second, the issue of judicial function for diversity purposes is a question of federal, not state, law. The Parker court was concerned with the unconstitutional delegation of judicial authority under the Pennsylvania Constitution, not whether the panel functioned as a judicial body under federal law. Third, the Parker court concluded "there is no usurpation of judicial authority here because not only are the petitioners afforded a judicial review of the determination of the panel, they are entitled to a trial de novo in a court." 483 Pa. at 126-127, 394 A.2d at 943, Quoting State ex rel. Strykowski v. Wilkie, 81 Wis.2d 491, 261 N.W.2d 434, 448 (1978). Thus, the court found no judicial usurpation in the panel because there was an opportunity for judicial review. Obviously, the availability of de novo appeal is not relevant to a determination of whether the panel is, in reality, another judicial tribunal.
 
 
 67
 This case is similar to Wheeler v. Shoemaker, 78 F.R.D. 218 (D.R.I.1978), where the district court found a medical malpractice scheme similar to Pennsylvania's did not oust the federal court of jurisdiction. Under the Rhode Island statute at issue in Wheeler, the panel was appointed by the presiding justice of the superior court. State rules of evidence and procedure applied. The determination of the panel could be admitted at a subsequent trial de novo. The court held that the malpractice panel was an adjunct of the state court under the following logic:
 
 
 68
 The statute at bar denies the federal court initial jurisdiction. The first trial of the action for all practical purposes occurs before a state tribunal according to state rules of evidence and procedure. With respect to both settlement and the subsequent jury verdict, the hearing before the panel is likely to be the decisive battle between the litigants. After all the evidence has been initially weighed by the panel, the parties are likely to accept the liability and damages determinations of the panel to avoid the additional cost and uncertainty of a subsequent trial. Even at subsequent trial, the panel determinations, admitted as evidence, are likely to influence, if not determine, the jury verdict. The danger of local bias against the out-of-state plaintiff at the crucial panel proceedings is particularly real when the reviewing panel is not composed of judges who are selected for, sworn to and practiced in impartiality.
 
 
 69
 78 F.R.D. at 222-23 (citations omitted).
 
 
 70
 Other cases from other courts have found malpractice panels not tantamount to state courts where the arbitration procedures were of a less formal character. See, e. g., Woods v. Holy Cross Hospital, 591 F.2d 1164 (5th Cir. 1979) (no formal rules of evidence or procedure); Hines v. Elkhart General Hospital, 465 F.Supp. 421 (N.D.Ind.1979) ("drastic variation" between Rhode Island statute and Indiana statute). See generally Davison v. Sinai Hospital of Baltimore, Inc., 462 F.Supp. 778 (D.Md.1978); Wells v. McCarthy, 432 F.Supp. 688 (E.D.Mo.1977); Flotemersch v. Bedford County Hospital, 69 F.R.D. 556 (E.D.Tenn.1975).
 
 
 71
 The logic of Wheeler is compelling in this case. The Health Care Arbitration Act is not a "condition precedent to entry into the state judicial system," Maj. op. at 134, but a substitute for that system. Complex suits based upon medical malpractice differ substantially in proof, medical expertise and expense from the ordinary run of minor litigation involved in Pennsylvania's compulsory civil arbitration system. What litigant will bear the expense of two full-blown trials with two appearances of expert witnesses, dealing with the same issues twice? What litigant can assure the presence of medical experts not only once but twice? In fact, the entire structure of the Act seems to be founded on the premise that parties will not seek a second trial. Otherwise, the Act could not attain its purported goals of achieving a reasonable cost of professional liability insurance while assuring a prompt determination of each claim. 40 P.S. § 1301.102. Pennsylvania's experience under the Act bears out my view that the arbitration panel is de facto the sole forum for the adjudication of malpractice claims. The most recent annual report of the newly-appointed administrator of Arbitration Panels for Health Care filed on September 1, 1979, shows that of the 2,466 claims filed with the Board, only two cases have reached the Court of Common Pleas.[4] I can only conclude that the panel is a surrogate for the state court.
 
 
 72
 By creating a separate judicial forum, Pennsylvania has attempted to limit the right of access of residents and non-residents, at least in the first instance, to a Pennsylvania court. This issue is not new and was dealt with by the Supreme Court in Railway Company v. Whitton's Administrator, 80 U.S. (13 Wall.) 270, 20 L.Ed. 571 (1871), an action for wrongful death by an Illinois citizen against a Wisconsin corporation under the Wisconsin Wrongful Death Statute. The statute provided "that such action shall be brought for a death caused in this state, and, in some court established by the constitution and laws of the same." 80 U.S. at 285. Notwithstanding, the Court determined that it retained diversity jurisdiction, holding:
 
 
 73
 In all cases where a general right is thus conferred, it can be enforced in any Federal court within the State having jurisdiction of the parties. It cannot be withdrawn from the cognizance of such Federal court by any provisions of State legislation that it shall only be enforced in a State court. The statutes of nearly every State provide for the institution of numerous suits, such as for partition, foreclosure, and the recovery of real property in particular courts and in the counties where the land is situated, yet it never has been pretended that limitations of this character could affect, in any respect the jurisdiction of the Federal court over such suits where the citizenship of one of the parties was otherwise sufficient. Whenever a general rule as to property or personal rights, or injuries to either, is established by State legislation, its enforcement by a Federal court in a case between proper parties is a matter of course, and the jurisdiction of the court, in such a case, is not subject to State limitation.
 
 
 74
 80 U.S. at 286.
 
 
 75
 The appellees contend that this case is not analogous to Railway Company but is similar to Woods v. International Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949). In Woods, a Mississippi statute precluded a corporation not qualified to do business in Mississippi from maintaining "any action or suit in any of the courts of this state." 337 U.S. at 539, 69 S.Ct. at 1237. The plaintiff, a Tennessee corporation not qualified to do business in Mississippi, brought suit in a Mississippi federal district court. The court concluded
 
 
 76
 that a right which local law creates but which it does not supply with a remedy is no right at all for purposes of enforcement in a federal court in a diversity case; that where in such cases one is barred from recovery in the state court, he should likewise be barred in the federal court.
 
 
 77
 337 U.S. at 538, 69 S.Ct. at 1237. Woods holds that a state may limit all right to recovery for a substantive cause of action. This is not at all inconsistent with the holding of Railway Company that a state having created a substantive right may not limit the forum for a right to recovery to only state courts.
 
 
 78
 Pennsylvania has not sought to eliminate the right to recovery but has channeled all plaintiffs to a special state judicial forum thinly disguised as an administrative agency. Under Railway Company, this court is not deprived of its diversity jurisdiction. A similar conclusion was reached in Markham v. City of Newport News, 292 F.2d 711 (4th Cir. 1961). In Markham, Virginia passed a statute providing that no tort action shall be instituted against a city or political subdivision of the Commonwealth of Virginia "except in a Court of the Commonwealth established under or pursuant to the Constitution of Virginia." 292 F.2d at 712. Plaintiff, a California resident, commenced the action in a Virginia federal district court. Relying on Railway Company, the Fourth Circuit reversed the district court and held that the federal courts could entertain diversity jurisdiction. I believe the rule it enunciated applies to this case:The laws of a state cannot enlarge or restrict the jurisdiction of the federal courts or those of any other state. It necessarily follows that whenever a state provides a substantive right and a remedy for its enforcement in a judicial proceeding in any state court, a judicial controversy involving the right may be adjudicated by a United States District Court if it has jurisdiction under the Constitution and laws of the United States.
 
 
 79
 292 F.2d at 716 (footnote omitted).
 
 
 80
 I am compelled to conclude that the Health Care Act creates another judicial forum in Pennsylvania's judicial system and it is not an administrative agency. Therefore, this court's power and duty to entertain diversity jurisdiction is not precluded.[5] To hold otherwise, as the majority does, is to allow states to abrogate a nonresident's right to an impartial forum by transferring a cause of action from one court to another and simply labeling the latter an "arbitration panel." "Diversity of citizenship jurisdiction was conferred in order to prevent apprehended discrimination in state courts against those not citizens of the State." Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). There is a grave danger under the majority approach that states will be permitted to encroach on the protections afforded by diversity jurisdiction.[6]
 
 
 81
 The majority's reasoning is that under Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1944), as modified by Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), and Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958) the federal courts should not exercise diversity jurisdiction over these claims. It concludes "that Erie, which requires federal courts to treat diversity claims so as to discourage forum shopping and to reach results identical to the state courts, requires us to give effect to this condition precedent," Maj. op. at 135, by requiring first resort to the panel. I believe this court is not bound by the Health Care Act under the foregoing cases.
 
 
 82
 The majority correctly states that Guaranty Trust provides an outcome determinative test. The inquiry is thus "whether (the) statute concerns merely the manner and the means . . . (or whether it) significantly affect(s) the result of a litigation." 326 U.S. at 109, 65 S.Ct. at 1470. In Hanna, the Court added that the outcome determinative test must be applied in light of the policies of Erie, to discourage forum shopping and preserve the nature of the litigation. The majority concludes that the statute of limitations, held to be substantive in Guaranty Trust, is analogous to the arbitration panel here because both regulate the time and means of entry to the courtroom.
 
 
 83
 I find that analogy puzzling. A statute of limitations controls the parameters of a right to a remedy. On the other hand, the Health Care Act, although it no doubt affects the right to a remedy,[7] is facially a means of regulating the entry to the courtroom. In that sense the Act is closer to the federal rule governing manner of service held to prevail over the state rule in Hanna. As Professor Ely has observed, Hanna served to expand the reach of federal jurisdiction that had been contracting since Erie And not to restrict federal rights.
 
 
 84
 It is true that there was some attempt in the Court's opinion to suggest that Erie might mean different things in different contexts, but that should not be taken too seriously: what Hanna really gave us, whether the Court was fully aware of it or not, was yet another rendition of Erie. And a singularly hard-hearted rendition it is: any federal rule (or at least any Federal Rule) that is even arguably procedural is to be applied in a diversity action, state law to the contrary notwithstanding. This surely does not seem even remotely to capture Erie's true meaning. But the Supreme Court is the Supreme Court, and seven is a majority of nine even when Justice Harlan is one of the two. Hanna therefore may not be Erie, but it seems to be the law.
 
 
 85
 Ely, The Irrepressible Myth of Erie, 87 Harv.L.Rev. 693, 697 (1974). Unlike the majority, I do not view Guaranty Trust as mandating a finding that the arbitration panel establishes substantive rights. Rather, I believe the panel is a procedural device for allocating cases within the State of Pennsylvania. As I discussed above, the panel is actually another court of the state. The substantive legal rights of the parties before the panel and the federal court will be the same. Only the forum will differ.
 
 
 86
 The majority is fearful that the "outcome of a case (will) depend on whether it was brought in a state or federal court . . . ." Maj. op. at 134, Citing Marquez v. Hahnemann Medical College and Hospital, supra, citing Witherow v. Firestone Tire & Rubber Co., 530 F.2d 160 (3d Cir. 1976). I share these same concerns but believe the majority's holding will lead to different results in state and federal court. In the state court, I. e., the arbitration panel, a patient can eventually get a hearing. His right to a federal forum, however, becomes more illusory than real. Only if the patient is willing to endure double expense and time delays, and overcome a possible adverse finding of the panel will he be able to obtain federal jurisdiction.
 
 
 87
 I recognize that for the present a finding of federal jurisdiction in this case will give out-of-state plaintiffs an advantage over in-state plaintiffs: the ability to get a prompt hearing. Pennsylvania plaintiffs, unless the Pennsylvania Supreme Court reconsiders, will still have to endure long delays before they can obtain a hearing before an arbitration panel. However, Pennsylvania citizens have the ability to reform their procedures through their political processes. Out-of-state residents do not. The very existence of diversity jurisdiction represents a decision by Congress that citizens of another state shall have a right to a fair federal forum, even though there may be a danger of forum shopping.[8]
 
 
 88
 The majority's final reason for finding no federal jurisdiction is under the Supreme Court's balancing approach in Byrd v. Blue Ridge Electrical Cooperative, Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). In Byrd, the Court concluded the determination of whether the plaintiff was an employee under the South Carolina Workmen's Compensation Act was a jury question in federal court, even though it would be decided by a judge in a South Carolina state court. The Court reached its result by balancing the state interests with the federal interests in light of the outcome determinative test. The majority attempts to distinguish Byrd in several ways. In Byrd the Supreme Court found no legitimate state interest in not allowing the jury to decide the employee question. The majority claims in this case Pennsylvania has a legitimate state interest in providing liability insurance at a reasonable cost and in promptly adjudicating claims. I have no doubt that the interest of the legislature in enacting a malpractice adjudicatory scheme is legitimate, indeed commendable. However, I do not believe the scheme at issue in this case accomplishes a legitimate state objective.[9] Its characterization by the majority as "a resounding flop" appears well founded. Maj. op. at 136. Thus, I believe the state interest in this plan rises no higher than the interest in Byrd.
 
 
 89
 The second factor the Supreme Court considered important in Byrd was the federal interest in a jury trial. Although recognizing that "(a)ppellants' most effective legal argument is based on the affirmative countervailing federal considerations," maj. op. at 138, the majority nonetheless finds no countervailing federal policy. Rather, it claims that the panel's function is consistent with the policy of arbitration as espoused by the Supreme Court in labor law cases. I believe this analogy is misleading. The arbitration policy in labor law is based on the consent of the parties as expressed in collective bargaining agreements. Arbitration is the terminal point of Consensual grievance machinery. The arbitration under the Health Care Act is compulsory. By agreement of the parties, labor arbitration permits judicial economy and an adequate and speedy remedy. On the other hand, the Health Care Act is not consensual and will require two full trials before an injured patient can have his case heard by a jury and it offers a slim chance of a remedy. Moreover, the panel does not involve arbitration at all but is a substitute judicial forum. Thus, I fail to see how the Health Care Act furthers the federal policy manifest in labor arbitration.
 
 
 90
 The majority further claims the Malpractice Panel does not alter the character of the later federal litigation in a manner inconsistent with that permitted under Rule 53(e)(3) of the Federal Rules of Civil Procedure providing for the findings of fact by a court-appointed master, even though the jury is presented with the panel's findings. This logic is not compelling because resort to a master is not a favored mechanism, to be used only in complex cases, and "shall be the exception and not the rule." Fed.R.Civ.P. 53(b). The federal policy against the use of masters in all but the most complex cases is not consistent with the use of a state malpractice panel's findings in any case, regardless of complexity, concerning medical injury.
 
 
 91
 The majority also claims the malpractice panel does not countervail federal concerns because Congress has shown confidence "in the jury's ability to evaluate even the most compelling expert presentations." Maj. op. at 140. I believe this argument defeats itself. Congressional high regard for a jury's ability to evaluate the proof is inconsistent with a state policy which shows distrust of juries. In sum, the majority has failed to convince me that the Act is consistent with federal considerations.
 
 
 92
 Rather, I agree with Wheeler v. Shoemaker, supra, that the Health Care Act, in its present form, offends important federal interests. In Wheeler, the court noted that the requirement of going to the arbitration panel, deferring the parties from incurring the additional expense of going to a second trial, as well as the admissibility of the panel's determination, would run contrary to the federal interest in allowing the full and fair litigation to be decided by the jury. 78 F.R.D. at 226. Furthermore, the court concluded that the distrust of juries evidenced by the state malpractice scheme and the state's desire to decrease the number of successful malpractice claims would run against the federal interest of maintaining the appearance of strict neutrality. 78 F.R.D. at 225-28. Finally, the Wheeler court held that the requirement of an arbitration panel was at odds with the goals of the federal courts in convenience and the economical administration of justice. 78F.R.D. at 229. I believe the analysis in Wheeler is directly applicable to the Pennsylvania Act and shows that the state scheme runs contrary to federal concerns.
 
 
 93
 The third factor in Byrd reaffirms the outcome determinative analysis of Guaranty Trust. The Court in Byrd held that even if the determination of employee status was made by a jury in federal court, a different result from state court was improbable. As discussed Supra at 135-136, I do not believe federal jurisdiction in this case will lead to a substantially different result under Guaranty Trust and Hanna. Only the forum, not substantive legal rights, will be different.
 
 
 94
 I believe that under the Byrd balancing approach this court should exercise jurisdiction over the claims of appellants in these cases. The Health Care Act in its present form advances no legitimate state interest. The Act countervails many important federal considerations. And finally, the exercise of federal jurisdiction will not substantially alter the legal disposition of the substantive rights of the parties.
 
 
 95
 I recognize that the result of my conclusions will be to give out-of-state plaintiffs some advantage over in-state plaintiffs because they will have a ready, unobstructed forum for the adjudication of their claims. However, as this court has held, "the conceptual basis of diversity jurisdiction itself discriminates in favor of non-citizens on the theory that, otherwise, they may be discriminated against; and it is premised on the assumption that a non-citizen may obtain a different result in federal court than in state court." Witherow v. Firestone Tire & Rubber Co., 530 F.2d 160, 164 (3d Cir. 1976). This fear of a different result is slight as compared to my fear of discrimination against these non-resident plaintiffs who have no remedy in the Pennsylvania political process. I must respectfully dissent.
 
 
 
 [1]
 The Pennsylvania statute provides that filing a complaint with the administrator of the arbitration panel shall toll the running of the statute of limitations. 40 P.S. § 1301.401
 
 
 [2]
 We agree with the district court's determination of the time computation
 
 
 [3]
 Parker v. Children's Hospital, 483 Pa. 106, 394 A.2d 932 (1978), dealt with the Act under examination here. It held that the Act did not violate plaintiff's state-guaranteed right to a jury trial. Id at 118-124, 394 A.2d at 939-42. The Act does no more, the court reasoned, than create a "Precondition " to entry into the courts. Id. at 126, 394 A.2d at 943. It preserves a plaintiff's right to a final determination of the factual issues by the jury. Parker is not, of course, binding on this court on the exclusively federal issue raised by plaintiffs, but we nevertheless accept the Pennsylvania Supreme Court's characterization of the arbitration procedure as a mere precondition to access to state courts
 
 
 [4]
 Article 1, § 6 of the Pennsylvania Constitution provides:
 Trial by jury shall be as heretofore, and the right thereof remain inviolate. The General Assembly may provide, however, by law, that a verdict may be rendered by not less than five-sixths of the jury in any civil case.
 
 
 [5]
 Several federal courts have examined statutes similar to the Pennsylvania Act and have also concluded that the arbitration process is a condition precedent to entry into federal court. See, e. g., Woods v. Holy Cross Hospital, 591 F.2d 1164, 1168-69 (5th Cir. 1979) (applying Florida law); Hines v. Elkhart General Hospital, 465 F.Supp. 421, 425 (N.D.Ind.) (applying Indiana law), Aff'd, 603 F.2d 646 (7th Cir. 1979); Flotemersch v. Bedford County General Hospital, 69 F.R.D. 556, 558 (E.D.Tenn.1975) (applying Tennessee law)
 The Supreme Court's decision in Bernhardt v. Polygraphic Co., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956), also supports our conclusion. In Bernhardt, the defendant, who had removed the case to federal court, asserted that the federal court should order arbitration of the claim under the contractual arbitration clause. The Supreme Court refused to order arbitration, holding the United States Arbitration Act, 9 U.S.C. §§ 1-3, inapplicable because the contract was not in interstate commerce and concluding that Vermont state law, which would not give effect to the arbitration clause, should apply. The Court stated:
 If the federal court allows arbitration where the state court would disallow it, the outcome of litigation might depend on the courthouse where suit is brought. For the remedy by arbitration, whatever its merits or shortcomings, substantially affects the cause of action created by the State. The nature of the tribunal where suits are tried is an important part of the parcel of rights behind a cause of action. The change from a court of law to an arbitration panel may make a radical difference in ultimate result.
 Id. at 203, 76 S.Ct. at 276. Similarly, in these cases, refusal to require arbitration could cause a different result, and thus would be at odds with the Erie mandate.
 
 
 [6]
 Appellants neither argued the due process issue nor alleged jurisdiction sufficient to present a due process claim. We therefore have not considered it. We note, however, that the Supreme Court of Pennsylvania, no doubt influenced by the deplorable operation of the arbitration program, has recently assumed plenary jurisdiction over a declaratory judgment action to review its conclusion in Parker v. Children's Hospital, 483 Pa. 106, 394 A.2d 932 (1978), that the arbitration program does not violate state constitutional guarantees. Mattos v. Thompson, E.D.Misc.Docket No. 79-124 (Pa., filed Sept. 27, 1979)
 
 
 [7]
 [1979] Ann.Rep.Administrator for Arbitration Panels for Health Care 17 app. [ereinaftercited as Frankston Report ](statistics through August 31, 1979)
 
 
 [8]
 The Rhode Island statute at issue in Wheeler requires the trial court to refer malpractice cases to a panel only after they are initially filed with the court. Under the Pennsylvania system, arbitration is a condition precedent to proper filing of the complaint in the court system. Parker v. Children's Hospital, 483 Pa. 106, 394 A.2d 932, 943 (1978). The United States Court of Appeals for the Fifth Circuit, analyzing a Florida statute similar in this regard to Pennsylvania's statute, has distinguished Wheeler by stating: "A state-mandated referral to mediation after an action is filed clearly differs from a state statutory scheme wherein mediation is a jurisdictional prerequisite to any court action; it was recognized in Wheeler that Rhode Island's malpractice scheme 'differs significantly' from that in Tennessee (or Florida). 78 F.R.D. at 221." Woods v. Holy Cross Hospital, 591 F.2d 1164, 1169 n.7 (5th Cir. 1979). In light of appellants' reliance on Byrd in this case, which we interpret to be a request to avoid the state procedure totally because it inherently interferes with an affirmative countervailing federal interest, we do not deem the distinction in Woods to be material and therefore do not rely on it. No matter when or how the claim is referred to arbitration, the federal interests asserted by appellants would still, they argue, countervail
 
 
 [9]
 Gluck v. Baltimore, 81 Md. 315, 325, 32 A. 515, 517 (1895)
 
 
 [10]
 Hynes v. New York Central R. Co., 231 N.Y. 229, 235, 131 N.E. 898, 900 (1921) (Cardozo, J.) citing Pound, Mechanical Jurisprudence, 8 Colum.L.Rev. 605, 608, 610 (1908)
 
 
 [11]
 Jones, An Invitation to Jurisprudence, 74 Colum.L.Rev. 1023, 1025 (1974)
 
 
 [1]
 I concur in the majority's view that the injuries to Mr. McCormick accrued after the effective date of the Health Care Arbitration Act
 
 
 [2]
 One plaintiff in these consolidated actions, Mrs. McCormick, alleges damages for loss of consortium due to injuries to her husband. The majority sweeps her within the purview of the arbitration Act without disclosing how she is a "patient or his representative" within the language of the statute. I do not believe Mrs. McCormick is required by the Act to submit to primary jurisdiction in the arbitration panel. Rather, she has a common law right to bring suit for her tort claims in a state court or a federal court under diversity jurisdiction. The failure to include the spouse of the injured within the malpractice scheme is but one indication of the shortfalls of that system
 
 
 [3]
 The majority does not discuss the issue I find controlling: whether the panel really is an arbitration panel as labeled or, as I believe, a judicial body
 
 
 [4]
 (1979) Ann.Rep. Administrator for Arbitration Panels for Health Care, 17 app
 
 
 [5]
 The district court and the majority in the instant case find support for their view in Marquez v. Hahnemann Medical College and Hospital, 435 F.Supp. 972 (E.D.Pa.1976), an earlier opinion considering the identical issues, which concluded the federal court does not have diversity jurisdiction. I find Marquez unconvincing because it rests on Woods v. Interstate Realty Co., supra, rather than Railway Co. v. Whitton's Administrator, supra. My earlier discussion, Supra at 134-135, discloses why any reliance on Woods is misplaced. Furthermore, Marquez has failed to consider the proposition that the panel is a judicial forum
 The majority further cites Bernhardt v. Polygraphic Co., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1950), to support its conclusion. There, the Supreme Court, in dicta, stated that a change of forum from a court of law to an arbitration panel may make a radical difference in the outcome. However, the Supreme Court in Bernhardt Made it clear that the arbitration panel it described had the common garden-type arbitration characteristics. Because I believe the Health Care Act actually creates a judicial forum, and not an arbitration panel, reliance on Bernhardt is misplaced. See infra at page 148.
 
 
 [6]
 Congress has been considering legislation to abolish or alter diversity jurisdiction. See generally Rowe, Abolishing Diversity Jurisdiction: Positive Side Effects and Potential for Further Reforms, 92 Harv.L.Rev. 963 (1979). See also Rosenn, Trends in Administration of Justice in the Federal Courts, 39 Ohio St.L.J. 791 (1978). I express no opinion on the merits of diversity jurisdiction but wish to point out that it is up to Congress, not the states on an ad hoc basis, to resolve the issue
 
 
 [7]
 In its present structure, the Act virtually bars a plaintiff's right to recovery because of the practical difficulty of obtaining a hearing before the panel
 
 
 [8]
 It has been suggested that the "evils" of forum shopping have been overstated. Redish & Phillips, Erie And The Rules Of Decision Act: In Search Of The Appropriate Dilemma, 91 Harv.L.Rev. 356, 375-77 (1977)
 
 
 [9]
 There is no doubt that the backlog in the arbitration panel will lead to more reasonable insurance rates because patients in fact are denied the opportunity for recovery. However, I decline to ascribe the legislature an intent to lower rates by denying to patients, meritorious as well as frivolous, their day in court