**Timothy R. HUM, individually and on behalf of a class of persons similarly situated, Plaintiff,**

**v.**

**Gerard H. DERICKS, Jr., M.D.; Orthopaedic & Sportsmedicine Clinic of Hawai'i, Inc., a Hawai'i corporation; Ligastic Investment Corp., a Hawai'i corporation; Orthomed, a French corporation; Orthosport International, a Hawai'i general partnership; Surgicare of Hawai'i, Inc., a Hawai'i corporation; Honolulu Surgery Center, L.P., a Tennessee limited partnership dba Surgicare Hawai'i; and SCA–Honolulu, Inc., a Tennessee corporation, Defendants.**

Civ. No. 94–00890 DAE.

United States District Court,
D. Hawai'i.

Aug. 1, 1995.

Kenneth K.P. Wong, Beck & Taylor, Honolulu, HI, for plaintiff.

Mary L. Lucasse, Patricia C. Aburano, Burke Sakai McPheeters Bordner Iwanaga & Estes, Honolulu, HI, for Gerard H. Dericks, Jr., Orthopaedic & Sportsmedicine Clinic of Hawai'i, Inc., Ligastic Investment Corp., Orthosport International.

Arthur F. Roeca, Roeca Louie & Hiraoka, Honolulu, HI, Joseph A. Woodruff, James Walker, Waller Lansden Dortch & Davis, Nashville, TN, for Surgicare of Hawai'i, Inc., Honolulu Surgery Center, L.P., SCA–Honolulu, Inc.

### ORDER DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

DAVID ALAN EZRA, District Judge.

Defendants Gerard H. Dericks, Jr., M.D. ("Dericks"), Orthopaedic & Sportsmedicine Clinic of Hawai'i, Inc., Ligastic Investment Corp., and Orthosport International (collectively "Dericks Defendants") filed their mo-

tion on March 21, 1995 for an order determining that Plaintiff Timothy R. Hum's action may not be maintained as a class action. Plaintiff Timothy R. Hum ("Hum") filed his motion for class certification on April 17, 1995. The Dericks Defendants, along with Defendants Surgicare of Hawai'i, Inc., Honolulu Surgery Center, dba Surgicare Hawai'i, and SCA–Honolulu, Inc. (collectively "Surgicare Defendants") oppose Hum's motion.

The court heard both motions on May 22, 1995.[1] Donald A. Beck, Esq., Robert R. Taylor, Esq., and Kenneth P. Wong, Esq., appeared on the briefs or at the hearing on behalf of Plaintiff Hum. Edmund Burke, III, Esq., and Patricia C. Aburano, Esq., appeared on the briefs or at the hearing on behalf of Dericks Defendants. Arthur F. Roeca, Esq., and H. William Goebert, Jr., Esq., appeared on the briefs or at the hearing on behalf of Surgicare Defendants. At the hearing, the court ordered supplemental briefing on the issue of class compliance with the MCCP procedure of HRS § 671–12(a). After hearing oral argument and reviewing the supporting, opposing and supplemental memoranda, the court DENIES Plaintiff's motion and GRANTS Dericks Defendants' motion. The court will not certify the proposed class.

## BACKGROUND

Plaintiff Timothy Hum seeks to certify a class in litigation arising from medical treatment by Dr. Gerard H. Dericks, Jr. In June 1993 and November 1993, Dericks performed two arthroscopic surgeries on Hum's right knee, implanting artificial ligaments not approved by the Food and Drug Administration ("FDA"). Hum's complaint asserts legal theories of conspiracy, unfair and deceptive trade acts and practices, misrepresentation, failure to give informed consent, negligence, breach of express and implied warranties, strict product liability, and medical malpractice.

Hum seeks to represent 200 other patients who also had artificial ligaments implanted by Dericks. By his motion, Hum requests certification pursuant to Rules 23(b)(1)(B) and/or 23(b)(3) a class defined as follows:

a. All persons who had surgically implanted in their knee(s) at Surgicare Hawai'i (hereinafter "Surgicare") in Hawai'i one or more Ligastic or Lars artificial ligaments (hereinafter referred to as "Ligaments") that were manufactured, imported and/or distributed and/or sold by some or all of Defendants;

b. All persons who had a surgical implant of one or more Ligament(s) in their knee(s) performed by Dr. Gerald Dericks, Jr. (hereinafter "Dericks") at Surgicare, and who were not provided written informed consent by Dericks or Surgicare prior to the implantation that disclosed, among other things, that said Ligaments were experimental and not approved by the FDA and that they were taking part in a research study, clinical investigation or experiment involving the Ligaments;

c. All persons who had a surgical implant of one or more Ligaments in their knee(s) performed by Dericks at Surgicare, and who purchased said Ligament(s) and implantation and medical service(s) from Dericks or one of his business entities and who purchased medical services connected with the implants from Surgicare.

Hum's Motion, at 2.

The Ligastic artificial ligament ("Ligastic") was manufactured in France by a company named Orthomed under the direction of a Dr. Laboureau. In late 1991 or early 1992, Laboureau left Orthomed and began manufacturing his own Lars artificial ligament ("Lars") which is virtually the same as the Ligastic.

Dericks began implanting the Ligastic in the proposed class members beginning in

---

1. For convenience, the court will refer throughout this order only to Hum's Motion for Class Certification. However, the court has considered all the papers filed in support of and opposition to both Hum's motion and Dericks Defendants' motion for an order determining that Hum's action may not be maintained as a class action.

December 1989 at Defendant Surgicare, an outpatient ambulatory surgery center. Dericks switched from the Ligastic to the Lars in 1992. Dericks has admitted that the Ligastic and Lars have not received FDA pre-market approval or an investigational device exemption from the FDA. Hum alleges that the Defendants did not obtain informed consent from proposed class members and that they failed to inform patients that the ligaments lacked FDA approval. Hum also indicates that Dericks had a financial interest in the ligaments, that he promoted the development and distribution of the Ligastic and Lars in Hawai'i and California, and that the Defendants overcharged patients and their insurance carriers for the ligaments and for related services.

## STANDARD OF REVIEW

 The decision to grant or deny class certification rests within the sound discretion of the trial court. *Yamamoto v. Omiya*, 564 F.2d 1319, 1325 (9th Cir.1977). In order for a class action to be certified, plaintiffs must establish all of the requirements of Federal Rule of Civil Procedure 23(a) and at least one of the alternative requirements of Rule 23(b). *Blake v. Arnett*, 663 F.2d 906, 912 (9th Cir. 1981). Rule 23(a) provides as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These four requirements have been more conveniently termed: (1) "numerosity"; (2) "commonality"; (3) "typi-

cality"; and (4) "adequacy." *See Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559 (8th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983); *Yslava v. Hughes Aircraft Co.*, 845 F.Supp. 705, 712 (D.Ariz.1993).

## DISCUSSION

 Applying Rule 23, the court examines each requirement in turn. As a preliminary matter, the court notes that the parties have attempted to inject numerous issues into these motions that are better left for motions to dismiss or for summary judgment.[2] In ruling on a motion for class certification, the inquiry is limited to whether plaintiff has carried his burden of satisfying the class requirements; it is not at this stage of the proceedings appropriate to consider the merits of the proposed class action. *In re Synergen, Inc. Sec. Litig.*, 154 F.R.D. 265, 267 (D.Colo.1994). The court has an ongoing duty to ensure compliance with Rule 23(a), even after certification. Rule 23(c)(1) (certification may be amended); *Hervey v. City of Little Rock*, 787 F.2d 1223 (8th Cir.1986). If the court certifies a class and a subsequent motion undermines the requirements, the court could decertify the class. *See Baldridge by Stockley v. Clinton*, 139 F.R.D. 119 (E.D.Ark.1991) (decertifying class). *See also In re Orthopedic Bone Screw Products Liability Litig.*, 1995 WL 273597, *3–*4 (E.D.Pa. 1995) (declining to address defense of preemption by the MDA in motion for class certification).

### I. Numerosity

 Hum has not met the numerosity requirement. A movant for class certification will meet the first requirement of Rule 23(a) when he can show that the class is so numerous that joinder of all its individual members is impracticable. "Impracticable"

---

**2.** Surgicare Defendants argue that the Medical Devices Amendments to 21 U.S.C. §§ 301–360 (1976) ("MDA"), the Drugs and Devices section of the Federal Food, Drug, and Cosmetic Act, and the extensive regulatory scheme thereunder preempt Hum's claims. Dericks Defendants ar-

gue that Hum has no standing to allege violations of FDA regulations or to seek damages for medical expenses paid by his insurer. Finally, all Defendants argue that Hum's claims against them lack merit.

does not mean "impossible"; the representatives only need show that it is extremely difficult or inconvenient to join all the members of the class. *See, e.g. Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909 (9th Cir.1964). Numbers alone are not determinative of this question, which turns on the impracticability of joinder. *Daigle v. Shell Oil Co.*, 133 F.R.D. 600 (D.Colo.1990). This determination must be made on a case-by-case basis and depends upon the specific facts and circumstances presented. *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1319–20 (9th Cir.), *vacated on other grounds*, 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982), *amended*, 726 F.2d 1366 (9th Cir. 1984).

■ There is no magic number for determining when too many parties make joinder impracticable. Courts have certified classes with as few as thirteen members, and have denied certification of classes with over three hundred members. *See Dale Elecs., Inc. v. R.C.L. Elecs., Inc.*, 53 F.R.D. 531 (D.N.H. 1971); *Minersville Coal Co. v. Anthracite Export Ass'n*, 55 F.R.D. 426 (M.D.Pa.1971); 1 Herbert B. Newberg, *Newberg on Class Actions* § 3.03, at 136–37 (2d ed. 1985). Joinder of a small group may prove impracticable, while joinder of a large group may be more possible. *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.1985), *cert. denied*, 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986). Joinder is generally considered more practicable when all members of the class are from the same geographic area. *Andrews*, 780 F.2d at 132 (citing *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir.1981); *Dale*, 53 F.R.D. at 534). Where class members may be easily identified, joinder is also more practicable. *Id.* (citing *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981)).

■ Although the proposed class numbers 200, Hum has not demonstrated that joinder would be impracticable.[3] Hum argues that many of the class members do not yet know about the alleged problems concerning the ligament. At argument, counsel for Hum referred to the difficulty involved in discovering the identities of potential class members, whose medical records are confidential. However, this is not a difficulty which the procedures created for class actions were designed to remedy. Hum could make a motion for the appointment of a special master or invoke another procedure whereby potential class members might be notified without undue intrusion into confidential medical records.

■ Hum's citizenship presents one practical difficulty, but this difficulty does not render joinder "impracticable." Most of the proposed class members reside in Hawai'i. Hum resides in California. Hum could maintain this action in federal court as a class action, because non-diverse class members who are not class representatives do not destroy diversity. *In re School Asbestos Litigation*, 921 F.2d 1310 (3d Cir.), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1623, 113 L.Ed.2d 720 (1990). In contrast, joining non-diverse plaintiffs in a standard litigation would destroy complete diversity. However, this difficulty for Hum does not constitute the kind of "impracticability" that justifies a finding of numerosity. If it did, a diverse plaintiff could satisfy numerosity by seeking to certify a class of one named diverse plaintiff and one non-diverse class member. In the absence of class certification, this merely leaves Hum to proceed alone in federal court or together with the proposed non-diverse class members in state court.

Because most of the proposed class members reside in Hawai'i and are identifiable through Surgicare records, the court finds that Hum has not carried his burden of showing that joinder is impracticable. Hum has 200 potential and 39 likely class mem-

---

**3.** The parties agree that 200 patients at Surgicare had the ligaments implanted. While the parties quibble about who will qualify for the class, Defendants do not dispute that the potential class includes 200 patients. Courts do not require evidence of exact class size or identity of class members to satisfy the numerosity requirement. *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) (citations omitted).

bers; the latter have signed an affidavit supporting Hum's motion. He has not demonstrated that the 39 likely plaintiffs already signed up by counsel could not be joined, along with others yet to be identified. Hum has shown no sound reason why joinder here is impracticable.

## II. Commonality

 Rule 23(a)(2) requires that there be a common question of law or fact among the members of the class. The rule does not require that every question of law or fact be common to every member of the class. Instead, the commonality requirement is satisfied "where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." *Yslava v. Hughes*, 845 F.Supp. at 712 (quoting *American Finance System, Inc. v. Harlow*, 65 F.R.D. 94, 107 (D.Md.1974)).

### A. MCCP Procedure

As a preliminary matter, the court notes that while Hum and a few other proposed class members have gone through the Medical Claims Conciliation Panel ("MCCP") procedure required by HRS § 671–12(a), most others have not. Defendants argue that this precludes commonality of issues and typicality of plaintiffs, as some of the plaintiffs cannot proceed in this court. In Hawai'i state court, parties to a medical malpractice claim must go before the MCCP and then reject the panel's decision before suit may be brought in "any court of this State." HRS § 671–12(a). The panel conducts an informal hearing and, if no settlement is reached, files a written advisory decision, including a finding of damages, if any. HRS §§ 671–13, 671–15. If a party fails to cooperate with the MCCP process, costs and fees may be awarded by the court. HRS § 671–19.

 Under the doctrine of *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), federal courts sitting in diversity apply federal procedural rules but decide substantive issues of law in accord with applicable state law. Broadly speaking, "the core policy of *Erie* is that plaintiff should not be able to choose a different outcome for a lawsuit by filing in federal court rather than state court." *Olympic Sports Prods. v. Universal Athletic Sales Co.*, 760 F.2d 910, 913 (9th Cir.1985), *cert. denied*, 474 U.S. 1060, 106 S.Ct. 804, 88 L.Ed.2d 780 (1986). Here, where the state rule does not directly conflict with a federal rule, the court applies the *Erie* analysis under the Rules of Decision Act, measuring the applicability of state law by the substance-procedure distinction of *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), as modified by subsequent decisions.[4] The "outcome determination" test for substance versus procedure originated with *York* and was modified in *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). Under *Hanna*, the court inquires whether the "character or result of a litigation" would differ "materially" because the suit was brought in federal rather than in state court. *Id.* at 467, 85 S.Ct. at 1141.

 Because every procedural rule is in some sense outcome-determinative, however, the Supreme Court has cautioned against a literal application of the outcome test. *Hanna*, 380 U.S. at 466–68, 85 S.Ct. at 1141–42. In applying the test, the court must not invoke outcome determination as a kind of "talisman." *Id.* at 466–67, 85 S.Ct. at 1141–42. Rather, the court focuses on the twin policies underlying *Erie*: "discouragement of forum shopping and avoidance of inequitable administration of the laws." *Id.* at 467–68, 85 S.Ct. at 1142.

Several courts in other jurisdictions have addressed whether conditions precedent

---

4. *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) breathed life into the oversimplified outcome determination test of *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), after the criticism of *Guaranty* in *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*, 356 U.S. 525, 538, 78 S.Ct. 893, 901, 2 L.Ed.2d 953 (1958) (federal and state policy interests must be balanced to determine which rule should control; state interest outweighed by "strong federal policy against allowing state rules to disrupt the judge-jury relationship in federal court.").

placed by state law on the filing of medical malpractice actions apply in federal courts. A majority of courts addressing the question have concluded that such requirements are "substantive" and are applied by federal courts. *See, e.g., Feinstein v. Mass. Gen. Hosp.*, 643 F.2d 880 (1st Cir.1981); *Seoane v. Ortho Pharmaceuticals, Inc.*, 660 F.2d 146, 149 n. 4 (5th Cir.1981); *DiAntonio v. Northampton–Accomack Memorial Hosp.*, 628 F.2d 287 (4th Cir.1980); *Edelson v. Soricelli*, 610 F.2d 131 (3d Cir.1979); *Hines v. Elkhart Gen. Hosp.*, 603 F.2d 646 (7th Cir.1979); *Stoner v. Presbyterian Univ. Hosp.*, 609 F.2d 109 (3d Cir.1979). Some courts have disagreed, holding that the state rules do not apply. *See Adkins v. Commonwealth of Virginia*, 154 F.R.D. 139 (W.D.Va.1994); *Seck by Seck v. Hamrang*, 657 F.Supp. 1074 (S.D.N.Y.1987) (citing conflict with federal court's power to promote settlement under Fed.R.Civ.P. 16(c)); *Wheeler v. Shoemaker*, 78 F.R.D. 218 (D.R.I.1978).

The purposes of these statutory requirements for panel proceedings are generally similar. Like the Hawai'i statute, the procedures encourage early settlement and discourage the filing of frivolous claims. *See Tobosa v. Owens*, 69 Haw. 305, 312, 741 P.2d 1280 (1987).

However, the specific procedures vary from state to state. For example, several such statutes allow the medical panel's decision to be introduced as evidence at trial. *See Edelson v. Soricelli*, 610 F.2d at 139; *Hines v. Elkhart Gen. Hosp.*, 465 F.Supp. 421, 426 (N.D.Ind.), *aff'd*, 603 F.2d 646 (7th Cir.1979); *Seoane v. Ortho Pharmaceuticals, Inc.*, 660 F.2d at 148; *DiAntonio v. Northampton–Accomack Memorial Hosp.*, 628 F.2d at 291. The statute addressed in *Feinstein v. Mass. Gen. Hosp.*, 643 F.2d at 882, requires a plaintiff to post a bond after losing before the medical tribunal. In contrast, Hawai'i's MCCP statute does not require a bond and does not allow statements made to the MCCP or the decision of the MCCP to be introduced at trial. HRS § 671–16.

■ The court finds that the MCCP procedure in Hawai'i has very little effect, if any, on the outcome of a subsequent lawsuit. The determinations of the panel have no preclusive affect whatsoever on the subsequent litigation. *See* Darrell N. Braman, Jr. and Mark D. Neumann, "The Still Unrepressed Myth of *Erie*," 18 Univ.Balt.L.Rev. 403, 413 (1989) (arguing that unless *the results* of the state tribunals prevent a plaintiff from suing, the procedures are not outcome determinative). In so applying the outcome determinative test, the court reads it to ask whether, at the start of the litigation and before any available choices are foreclosed, the nature of the state law increases or decreases the plaintiff's chance of winning on the merits. *See Hanna*, 380 U.S. at 466–68, 85 S.Ct. at 1141–42; *See also* John H. Ely, "The Irrepressible Myth of *Erie*," 87 Harv. L.Rev. 693, 714 (1974). While in Hawai'i state courts the MCCP procedure is a prerequisite to suit, it does not determine the outcome of a lawsuit in state court.

■ Viewed in light of *Erie*'s twin aims, the MCCP proceeding does not directly or incidentally affect the litigation because no evidence from it can be admitted and it imposes no penalty upon a losing party who proceeds to litigation. *Cf. Towey v. Catling*, 743 F.Supp. 738 (D.Haw.1990) (this court held that attorney fee provisions of Hawai'i Arbitration Rules, which impose fees on plaintiffs who do not improve on their arbitration position by 15% or more, were substantive and applied after action was removed to federal court). Because the procedure has no affect on the outcome of the litigation and little effect on the conduct of the litigation, it will have little if any impact on the choice of forum. *See Hanna*, 380 U.S. at 468, 85 S.Ct. at 1142. While the Defendants argue in a conclusory fashion that forum shopping will ensue, they do not explain how. The court could envision a plaintiff attempting to avoid the MCCP procedures for convenience, but forum shopping based upon convenience is common and does not run counter to *Erie*. *See* Ely, *supra*, at 714 ("[F]orum shopping is not an evil per se. It is evil only if something evil flows from it; indeed, the very idea of diversity jurisdiction

was to provide an alternative to state court."). A plaintiff would usually choose a different forum because of an increased chance of winning the case there or because of a risk of incurring a penalty in another forum. Hawai'i's statute does not affect this choice.[5] Because it does not affect the merits of the parties' positions under state law, and because it imposes no additional method for parties in state court to have their cases conclusively adjudicated, the avoidance of Hawai'i's MCCP requirement in federal court also does not result in an inequitable application of the law. The court concludes that Hawai'i's MCCP requirement is procedural and does not apply to preclude malpractice actions brought in federal court on the basis of diversity jurisdiction.

For these reasons, the court finds that the proposed class plaintiffs are not required to go through the MCCP requirement. Because the court does not apply the requirement, it does not address Hum's argument regarding the "single file" rule. The MCCP factor will not weigh against a finding of commonality here.

### B. *Common Issues*

Hum lists the following issues, which he alleges are common to all proposed class members.

(1) Whether the Defendants acted in concert to import and promote the sale and implantation of the Ligaments, and the nature and extent of those activities;

(2) Whether the Ligaments were experimental and never approved by the FDA for implantation in human subjects;

(3) Whether Defendants concealed information from the 200 class members about implanting an experimental ligament in their bodies and taking part in an experiment and research study;

(4) Whether Defendants concealed information from insurance companies about

the Ligaments in order to carry out their common course of conduct;

(5) Whether Surgicare failed to monitor Dericks and failed to stop Dericks from implanting the Ligaments when it knew the Ligaments were not FDA approved and acquiesced because he was a part owner of and a top revenue producer for Surgicare;

(6) Whether Surgicare continued to conspire with Dericks by failing to even issue Dericks a reprimand over his 200 human experiments when, by contrast, Pali Momi Hospital immediately terminated his privilege for 5 implants; .

(7) Whether Dericks tampered with, altered or destroyed records of the 200 class members;

(8) Whether the Defendants violated numerous federal laws relating to the Ligaments, including the Medical Devices Amendments of 1976 21 USC § 360c, et. seq. and the detailed informed consent required by the FDA under 21 CFR 50.20 et seq. and any additional disclosure requirements under Hawai'i law;

(9) Whether the Ligament was an adulterated, misbranded and/or unsafe medical device under federal and/or state law;

(10) Whether the Ligaments were defective;

(11) Whether certain Defendants breached various express and implied warranties relating to the Ligaments;

(12) The financial relationships between Dericks, his corporations, the manufacturers of the Ligaments, and his partnerships with respect to the Ligaments;

(13) Whether Dericks and his staff concealed from the 200 class members, the financial relationships referred to in paragraph (12) above.

(14) Whether class members are "consumers" within the meaning of HRS Sec-

---

5. The court notes that the vast majority of malpractice cases are brought by Hawai'i plaintiffs against Hawai'i doctors and hospitals, making those cases ineligible for removal to Federal Court under diversity jurisdiction in any event.

tion 480–2, and whether the acts and omissions of Defendants constitute unfair and/or deceptive trade practices;

(15) Whether the acts and omissions of Defendants were part of a continuing conspiracy and/or concerted action such that Defendants are jointly and severally liable;

(16) Whether Dericks and Surgicare's written informed consents violated the medical and legal standard of care.

Hum's Motion for Class Certification, at 27.

 This list contains certain allegations concerning alleged fraud and products liability common to all proposed class members. Courts generally give the commonality requirement a permissive application, and it is usually found to be satisfied. *Jordan*, 669 F.2d at 1320. As discussed below, however, the larger issues in the case contain fewer common questions than individual ones, and the court will not certify the class based upon the predominance of common issues.

## III. Typicality

 The Ninth Circuit has held that a named plaintiff's claim will be typical of the class "where there is a nexus between the injury suffered by the plaintiff and the injury suffered by the class." *Jordan*, 669 F.2d at 1321. Thus, "a named plaintiff's claim is typical if it stems from the same event, practice, or course of conduct that forms the basis of the class claims and is based upon the same legal or remedial theory." *Id.* As discussed below, the damage caused to Hum may stem from Dericks' implantation of an artificial ligament in the wrong location, not from the implantation of an artificial ligament itself. This potentially unique injury could make Hum atypical. His injury would not have arisen out of the same practice alleged to have been visited upon other members of the class. This issue notwithstanding, the court finds at this stage of the proceedings that Hum is sufficiently typical to satisfy the low standard of Rule 23(a)(3). *See Jordan*, 669 F.2d at 1321 ("[T]he class representative need not demonstrate a likeli-

hood of success on the merits in order to maintain a class action.") However, there is concern that Hum may not be able to continue as a suitable class representative.

## IV. Adequacy

 The final requirement of Rule 23(a) is that "the representative parties [must] fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). In *Jordan*, the Ninth Circuit explained that this element "requires that the named representative's attorney be qualified, experienced, and generally capable to conduct the litigation, and that the named representative's interests not be antagonistic to the interests of the class." 669 F.2d at 1323. The Defendants do not argue that counsel for Hum is not qualified or that Hum's interests are antagonistic to the other class members. The court finds the prerequisite of adequacy satisfied.

In sum, the court finds that Hum has satisfied the test of adequacy, and marginally satisfied the requirements of commonality and typicality. However, as indicated above, the court has found that Hum has not shown numerosity.

## V. Certification Requirements Under Rule 23(b)

In addition to the prerequisites spelled out in Rule 23(a), a party seeking class certification must demonstrate that one of the criteria in Rule 23(b) apply.

### A. *Rule 23(b)(3)*

 Hum seeks certification under 23(b)(3), which requires a finding that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). This section furnishes a means of deciding similar disputes efficiently and economically.

■ While common issues exist here, they do not predominate. Despite Hum's attempt to analogize to fraud or "course of conduct" cases, this case is at its heart a medical malpractice matter. It does not, as Hum asserts, analogize easily to securities fraud. *Blackie v. Barrack*, 524 F.2d 891, (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976), relied upon by Hum for the proposition that a single course of conduct gives rise to class certification, rested in part on the fact that individual reliance on misrepresentations need not be shown under the securities laws relevant to that action. 524 F.2d at 905. *Blackie* also rested on the fact that compliance with the securities laws is partially dependent upon the deterrent effect created by the availability of class actions. 524 F.2d at 902.

■ In every case of allegedly repeated conduct certain similar issues of law and fact can be found. This does not make all such cases prime candidates for class certification. In a securities fraud action, all of the plaintiffs have done the same thing that has occasioned their alleged injury: they have purchased company stock. Here, each plaintiff had a distinct injury, emotional and physical condition, and an individual consultation with Dericks. In addition, individual reliance need not be shown in many securities fraud actions. Given the fact that Dericks performed 200 operations on 200 different proposed plaintiffs (each with their own alleged injury), after having 200 individual consultations, the court believes that the issue of Dericks' "course of conduct" would degenerate into a series of mini-trials.

■ As to products liability, class certification in products liability actions is less favored than in securities actions.[6] In most products liability actions, facts relating to the design and development of a product will usually be the same for all plaintiffs. *See, e.g., In re A.H. Robins Co., Inc.*, 880 F.2d 709 (4th Cir.) (Dalkon Shield litigation certification upheld), *cert. denied*, 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *Dante v. Dow Corning Corp.*, 143 F.R.D. 136 (S.D.Ohio 1992) (breast implant litigation certified); *In re Copley Pharmaceutical, Inc., "Albuterol" Products Liability Litigation*, 158 F.R.D. 485 (D.Wyoming 1994) (Albuterol, prescription drug litigation certified where four batches of Albuterol had become contaminated, causing injuries to respiratory patients, spawning thirty lawsuits across the country). *But see Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667 (N.D.Ohio 1995) (denying class certification in DES litigation). Here, the proposed plaintiffs have had the ligaments implanted in different ways, to cure different injuries. In addition, the plaintiffs have failed to specify whether the alleged product "defect" results from manufacture, construction or design. *See Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 673, 675. The legal and factual issues differ even more here than in standard products liability actions, because this suit focuses on the actual implantation of the device more than on the defective nature of the device itself. Hum simply does not demonstrate to this court that the products liability aspects of this action present common questions suitable for class certification.

In addition, the crux of Hum's claims is not fraud or products liability at all, but rather

---

6. *Compare* the Advisory Committee Note to the 1966 Revision of Rule 23(b)(3), which states:

> A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried....

*with* the same Advisory Committee Note: "[F]raud perpetrated upon numerous persons by

the use of similar misrepresentation may be an appealing situation for a class action." Hum's citation to *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141 (S.D.Ohio 1992) does not distinguish the Advisory Committee's warning regarding mass torts here. In *Bowling*, where the court applied the requirements of Rule 23 in approving a class settlement relating to an allegedly defective heart valve, the court specifically stated that "[w]e make this decision in light of the fact that the requirements of Rule 23 are more easily satisfied for *settlement* purposes than for litigation purposes." *Id.* at 159 (emphasis added) (citing *In re A.H. Robins*, 85 B.R. 373, 378 (E.D.Va.1988), *aff'd*, 880 F.2d 709, 738–40 (4th Cir.1989)).

the lack of informed consent on the part of the patients. This aspect of Hum's case does not lend itself to a finding of commonality:

> The concept of informed consent is a complex one involving such issues as what information was supplied to each patient, what the emotional condition of each patient was, what each patient's understanding of the information conveyed was, and whether there was a necessity of dispensing with the requirement of informed consent due to emergency conditions. A determination of informed consent in each case depends on a separate inquiry into the facts surrounding each operation and an application of the facts to the governing legal principles.

*Harrigan v. United States,* 63 F.R.D. 402, 405 (E.D.Penn.1974). The facts surrounding the operations and the consent could vary widely from patient to patient. *See Arthur v. Zearley,* 320 Ark. 273, 895 S.W.2d 928 (1995) (class certification denied for 300 patients who had experimental product implanted; issues of informed consent would vary depending on each patient conference).

Hum argues that the law and facts surrounding informed consent do not vary greatly here, stating that "there is only one doctor, one surgery center, one experimental (investigational) product, and one State law." Hum's Reply to Surgicare Defendants' Opposition, at 8. Hum relies upon Dericks' testimony that he told all of his patients basically the same thing before surgery. Hum also relies upon his allegation, undisputed by Defendants, that the same types of consent forms were used for each patient. The consent forms lacked the information that the ligament was not FDA approved and that Dericks had a financial interest in the ligaments. However, Dericks did testify that he told patients that the ligaments were not FDA-approved. Dericks Deposition Excerpts, attached as Exhibit "A" to Dericks Defendants' Opposition, at 464.

Given the distinctly factual nature of the informed consent question, however, the court hesitates to find commonality on this issue based upon a somewhat ambiguous admission by Dericks that he told each patient similar things. The court cannot find based upon this record that the issue of informed consent is common in this matter. The emotional state and injury of each proposed plaintiff, not to mention possible variations in the conversations with Dericks, renders this area unsuitable for certification.

Regarding the issues of damages and causation, Defendants argue that not all of the proposed class members will need the ligaments removed and that only six to ten have done so already, citing to the deposition testimony of Dr. Alan B. Richardson, who has treated these patients after Dericks' departure. Richardson testified that "at least" one of the patients has not needed the ligament removed. Deposition of Dr. Alan B. Richardson, attached as Exhibit "C" to the Declaration of Kenneth Wong, at 112. Hum attaches declarations signed by 39 plaintiffs, all stating that they would not have had the surgery had they known of the ligament's lack of FDA approval. *See* Declarations, attached as Exhibit "B" to the Affidavit of Kenneth Wong. However, these affidavits do not show that each of these proposed plaintiffs will now have their ligaments removed. The court finds that issues as to the damage caused in each case will vary widely.

Defendants use Hum as an example of just how uncommon a proposed plaintiff can be here. According to his treating physician, Hum's injuries were actually caused by Dericks' focus on the *wrong* ligament. Richardson Deposition, attached as Exhibit "1" to Surgicare Defendants' Opposition, at 106–07. Richardson testified that he removed the ligament solely because it was the wrong treatment rather than because of any problem with all such ligaments. *Id.*

The impact of this evidence on commonality is borne out by the letter from Dr. Lonnie Paulos, who has examined Hum after the operations. Paulos Letter, attached as Exhibit "D" to Hum's Reply to Dericks Defendants' Opposition. Paulos elaborates on the unique nature of the diagnosis and surgery in Hum's case:

At no time in his preoperative evaluation or subsequent office notes did Dr. Dericks indicate that Mr. Hum had a posterior cruciate ligament injury. This means that either Dr. Dericks misdiagnosed the problem and thus treated Mr. Hum's knee inappropriately or that, secondly, Dr. Dericks actually damaged the posterior cruciate ligament during the surgical procedures that he performed.... To further add insult to injury, Dr. Dericks chose to use a synthetic ligament to reconstruct and further reinforce the extraarticual surgeries on the outer or lateral side of Mr. Hum's knee. The use of synthetic material in this manner is even far more experimental than the use of synthetic material as a cruciate substitute.

*Id.* This letter confirms for the court (1) that the injury was caused by something other than the ligament, and (2) that the variety of uses of the ligament on different patients, including Hum, present differing issues of alleged negligence and malpractice.

From the nature of the claims, Paulos' letter and Richardson's testimony, the court concludes that the individual medical history of each patient, the interaction of the ligament with each patient's body, and the possible multiple causes of the damages destroy the commonality of many of the issues here. Here, "[n]o one set of operative facts establishes liability. No single proximate cause applies equally to each potential class member and each defendant. Furthermore, the alleged tortfeasor's affirmative defenses (such as failure to follow directions, assumption of the risk, contributory negligence, and the statute of limitations) may depend on facts peculiar to each plaintiff's case." *In re Northern District of California, Dalkon Shield IUD Products Liability Litigation,* 693 F.2d 847, 853 (9th Cir.1982). (citation omitted).

Where the factual differences relating to the injuries, causation and damages are as numerous as they are here, the existence of certain common issues does not mandate class certification. While the court finds common issues sufficient to satisfy Rule 23(a)(2), the court does not find a strong showing of commonality.

The common issues here do not predominate over individual questions. ` *See In re Orthopedic Bone Screw Products Liability Litig.,* 1995 WL 273597, *8 (E.D.Pa.1995) (finding insufficient common issues to satisfy Rule 23(b)(3) in suit brought by patients implanted with orthopedic bone screws) (citing *Dalkon Shield,* 693 F.2d at 855–56; *Davenport v. Gerber Products Co.,* 125 F.R.D. 116, 119–20 (E.D.Pa.1983)). In addition, because Hum has not demonstrated the impracticability of joinder, he has not shown that the action is superior to other available methods for resolution of the dispute.

### B. *Rule 23(b)(1)(B)*

Arguing that the Defendants may not be able to pay judgments to all potential plaintiffs in actions brought separately, Hum seeks certification under Rule 23(b)(1)(B), which provides for certification where the prosecution of separate actions may substantially impair the ability of other members not parties to the actions to protect their interests. The drafters of Rule 23 intended 23(b)(1)(B) to apply to "limited fund" cases where numerous plaintiffs claim "against a fund insufficient to satisfy all claims." Advisory Committee Note to the 1966 Revision of Rule 23. The Ninth Circuit has expressly barred class certification under 23(b)(1)(B) for independent tort claims seeking compensatory damages, unless separate actions *"inescapably* will alter the substance of the rights of others having similar claims." *McDonnell Douglas Corp. v. U.S. Dist. Ct., C.D. of Cal.,* 523 F.2d 1083, 1086 (9th Cir. 1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976), (quoting *LaMar v. H & B Novelty & Loan Company,* 489 F.2d 461, 467 (9th Cir.1973)) (emphasis added).

Hum asserts that the Defendants will not be able to pay the claims of the plaintiffs, emphasizing particularly the potential availability of treble damages under HRS

§ 480–2 and punitive damages.[7] Hum also indicates that Dericks' insurance policy has an exception for fraud, potentially excluding certain awards to plaintiffs from its coverage. In examining the financial records of the parties and their insurance coverage, the court does not conclude that the Defendants and their insurers will clearly be unable to pay the projected damages here. As noted in *Dalkon Shield,* "not every plaintiff will prevail and not every plaintiff will receive a jury award in the amount requested." 693 F.2d at 852. Moreover, there exist several other Defendants whose finances Hum does not discuss.

## CONCLUSION

Because it finds that Hum does not satisfy the requirements of Rule 23(a)(1), 23(b)(3) and 23(b)(1)(B), the court DENIES Hum's Motion and GRANTS the Dericks Defendants' Motion. The court will not certify the proposed class.

IT IS SO ORDERED.

---

**7.** Hum submits a Complaint filed May 30, 1995 in the Circuit Court for the First Circuit, State of Hawai'i, alleging that Dericks is in default on a promissory note in the amount of $2.5 million. Plaintiff in that case has made a motion for an appointment of a receiver. Dericks submits an affidavit from the attorney representing him in that action, who states that the parties to the suit are in settlement negotiations, that it is unlikely that a receiver will be appointed, and that Dericks has not filed a petition for bankruptcy and has no immediate plans to do so.